1    ROB BONTA
     Attorney General of California
2    JANET N. CHEN
     Supervising Deputy Attorney General
3    JENNIFER BURNS
     Deputy Attorney General
4    State Bar No. 312364
       1300 I Street, Suite 125
5      P.O. Box 944255
       Sacramento, CA 94244-2550
6      Telephone: (916) 210-6393
       Fax: (916) 324-5205
7      E-mail: Jennifer.Burns@doj.ca.gov
     *Attorneys for Defendants*
8    *E. Lopez, N. Franz, and R. Escobar*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12

13   | **ALFRED DAVID SERNA,** | 3:22-cv-00841-JES-DEB |

14                                              Plaintiff,    **DECLARATION OF JENNIFER BURNS IN SUPPORT OF**
15                                                            **DEFENDANTS' MOTION FOR**
16            **v.**                                          **SUMMARY JUDGMENT**

17   **MADDEN, Warden, et al.,**

18                                            Defendants.

19

20        1.    I am a Deputy Attorney General in the California Attorney General's

21   Office, counsel of record for Defendants E. Lopez, N. Franz, and R. Escobar in this

22   matter. I am competent to testify to the matters set forth in this declaration, and if

23   called upon to do so, I would and could so testify. I submit this declaration in

24   support of Defendants' Motion for Summary Judgment.

25        2.    Attached as **Exhibit A** is a true and correct copy of excerpts from

26   Plaintiff Alfred David Serna's (CDCR No. E25219) deposition transcript cited to in

27   Defendants' motion for summary judgment.

28   / / /

                                    1

3.    Attached as **Exhibit B** is a true and correct copy of a Chrono signed by Correctional Counselor V. McSee attesting that Serna viewed video footage of the alleged incident.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 3, 2023, in Sacramento County, California.


   /s/ ***Jennifer Burns***
Jennifer Burns

SD2022304575
36990326.docx

# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4                                    )
                                     )
5     ALFRED DAVID SERNA,            )
                                     )
6              Plaintiff,            )
                                     )
7     Vs.                            )  CASE NO.
                                     )  3:22-cv-00841-JLS-DEB
8     MADDEN, Warden, et al.,        )
                                     )
9              Defendants.           )
                                     )
10

11

12

13

14

15          REMOTE DEPOSITION OF ALFRED DAVID SERNA

16              Thursday, February 23, 2023

17

18

19

20    Stenographically Reported by:
      Laura Bollschweiler
21    CSR No. 10500

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4
                                   )
5      ALFRED DAVID Serna,          )
                                    )
6              Plaintiff,           )
                                    )
7      Vs.                          ) CASE NO.
                                    ) 3:22-cv-00841-JLS-DEB
8      MADDEN, Warden, et al.,      )
                                    )
9              Defendants.          )
                                    )
10

11

12

13

14

15          Remote deposition of Alfred David Serna,

16    taken on behalf of Defendants, beginning at 9:09 a.m.

17    and ending at 11:16 a.m. on Thursday,

18    February 23, 2023, before Laura Bollschweiler,

19    Certified Shorthand Reporter No. 10500.

20

21

22

23

24

25

```
 1   A P P E A R A N C E S :

 2

 3   FOR PLAINTIFF:

 4           Alfred D. Serna(E25219)
             In Propria Persona
 5           Richard J. Donovan Correctional Facility
             480 Alta Road
 6           San Diego, CA 92179

 7   FOR DEFENDANTS:

 8           ROB BONTA
             Attorney General of California
 9           JENNIFER BURNS
             Deputy Attorney General
10           State Bar No. 312364
             1300 I Street, Suite 125
11           P.O. Box 944255
             Sacramento, CA 94244-2550
12           (916) 210-6393
             Jennifer.Burns@doj.ca.gov
13

14

15                         --oOo--

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2
     WITNESS                                    EXAMINATION
3
     Alfred David Serna
4          EXAMINATION BY MS. BURNS                          5

5

6

7                      E X H I B I T S

8

9    No.     DESCRIPTION                              ID'D

10   1     Defendants' Notice of Taking              10
           Plaintiff'S Deposition; and Request
11         For Production of Documents, four
           pages
12

13

14

15
                       --oOo--
16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         Thursday, February 23, 2023, 9:09 A.M.

3                   ---oOo---

4

5              ALFRED DAVID SERNA,

6    called as a witness, having been duly sworn by a

7    Certified Shorthand Reporter, was examined and

8    testified as follows:

9

10                  EXAMINATION

11   BY MS. BURNS:

12      Q.  Good morning, Mr. Serna.  Can you hear me

13   clearly?

14      A.  Yes, I can.

15         MS. BURNS:  And Madam Court Reporter, can

16   you hear me clearly?

17         THE REPORTER:  Yes, I can.

18   BY MS. BURNS:

19      Q.  Everyone here is appearing by video

20   conference.  My name is Jennifer Burns.  Mr. Serna,

21   today, I'm going to be taking your deposition

22   regarding your lawsuit, Serna v. Madden.  I represent

23   the Defendants, Officers Escobar, Lopez, and Franz.

24   You are the Plaintiff in this case, and you are

25   representing yourself, correct?

1        A.   Yes.

2        Q.   Mr. Serna, could you please state your name

3    and spell it for the record.

4        A.   Alfred David Serna, A-l-f-r-e-d D-a-v-i-d

5    S-e-r-n-a.

6        Q.   Thank you.  Mr. Serna, do you understand you

7    are testifying here under oath, meaning you are

8    testifying under penalty of perjury?

9        A.   Yes, I do.

10       Q.   Your testimony today is exactly as if you

11   were testifying in court.  Do you understand that?

12       A.   Yes.

13       Q.   Do you agree to tell me the full and

14   accurate truth today?

15       A.   Yes, I do.

16       Q.   Thank you.  We have a court reporter here

17   today.  The court reporter is typing everything that

18   we say.  So we both need to speak clearly and slowly,

19   not use gestures, and say "yes" or "no" instead of

20   "huh-uh" or "huh-uh" or shaking your head "yes" or

21   "no."  It is also important that we not speak over

22   each other or interrupt each other.  Does that all

23   make sense?

24       A.   Yes, it does.

25       Q.   If at any time you can't hear, please say



1    so.

2          Mr. Serna, have you ever been deposed

3    before?

4          A.  No, I haven't.

5          Q.  Okay.  Have you ever testified in court

6    before?

7          A.  No, I haven't.

8          Q.  Okay.  We are here today to get your best

9    testimony possible.  Estimates are okay, but guesses

10   are not.  For example, you can probably estimate the

11   distance you walked from your cell to the room that

12   you're in right now, but you would only be guessing

13   the distance that I walked to get to my office.  Does

14   that make sense?

15         A.  Yes, it does.

16         Q.  You can ask me to repeat a question or

17   rephrase a question if you don't understand it.  If

18   you answer a question, we will assume that you did

19   understand it.  If you want to change an answer,

20   please let me know, and I will let you do that right

21   away.  But if you make a substantive change, I or

22   another attorney in my office can comment on those

23   changes if this case goes to trial.

24         An example of a substantive change would be

25   if you testified that the light was green in a car



1    accident case and then changed your answer to state

2    that the light was red.  Does that make sense?

3        A.  Yes.

4        Q.  I may periodically take breaks, and I will

5    try to take a break at least once an hour to give the

6    court reporter a rest from typing.  But you can also

7    ask for a break.  I just ask that you answer any

8    pending question before requesting that break.

9            Is there any reason you cannot give me your

10   best testimony right now?

11       A.  No.

12       Q.  Is there any reason why the deposition

13   cannot go forward today?

14       A.  Well, I do want the -- I do want the -- I do

15   want to see the -- I do want to see the footage.  I

16   do want to see this footage.  I mean, I will.  I will

17   go with it, but I really wanted to see the footage,

18   because I haven't seen it yet.  But my testimony is

19   my testimony.  I'm going to -- I'm going to say it

20   because the way it happened.  So I'll go on.

21       Q.  Okay.  Thank you.  And we spoke a little bit

22   earlier about this.  But I will look into giving you

23   time to watch the video footage of the incident.

24   Okay?

25       A.  Okay.  Yes.



1      Q.   Is there anything that would impact your

2   ability to answer questions fully and truthfully

3   today?

4      A.   No.

5      Q.   Are you taking any medication that would

6   impact your ability to fully and accurately answer my

7   questions today?

8      A.   Well, I have -- I get migraine headaches,

9   but they come and go.  So maybe -- I don't know.

10  We'll see.  I mean, it depends.  It depends how much

11  I use my brain, you know.

12     Q.   Uh-huh.  Okay.  If at any time you feel that

13  you cannot fully and accurately answer my question

14  because of your medication, please let me know right

15  away.

16     A.   Okay.

17     Q.   What about any alcohol or drugs?

18     A.   No, I don't do them.

19     Q.   Okay.  Did you talk to anyone to prepare for

20  this deposition?

21     A.   No.

22     Q.   Did you review any documents to prepare for

23  this deposition?

24     A.   Yes.  I looked for my -- I looked for what

25  you asked for.



1      Q.  You were convicted of a felony?

2      A.  Yes.  Yes.  I struck out.  It's a

3  nonviolent, but it's a felony, yes.  Three strikes.

4      Q.  Thank you.  How long is your sentence?

5      A.  25 to life.

6      Q.  Are you eligible for parole?

7      A.  Yes.

8      Q.  Do you know when?

9      A.  2024.

10     Q.  Before your 2000 conviction, did you ever

11  serve a prison term?

12     A.  Yes.

13     Q.  What for?

14     A.  Armed robbery.

15     Q.  Anything before that?

16     A.  No.

17     Q.  Have you ever been convicted of a crime

18  involving falsehood, for example, fraud, false

19  statement, or forgery?

20     A.  No.

21     Q.  You're currently incarcerated at Richard J.

22  Donovan Correctional Facility, correct?

23     A.  Yes.

24     Q.  Have you been incarcerated at Donovan since

25  April 4, 2022, when the allegations in your complaint

1    took place?

2         A.   Yes.

3         Q.   Were you housed at any other prisons before

4    Donovan?

5         A.   Oh, yes.

6         Q.   Which ones?

7         A.   Corcoran, Lancaster, Kern Valley, Pleasant

8    Valley, Tehachapi, Wasco.   No.   Wasco is a county.

9    But that's it for prisons.

10        Q.   Do you know why you were transferred to

11   Donovan?

12        A.   Medical.   They say medical.   Yeah.   Medical

13   issue.

14        Q.   Which facility and housing unit were you

15   assigned to on April 4, 2022, the date of the

16   incident?

17        A.   I was assigned to 13, 13 block.   13 block,

18   one -- well, there was an incident.   The incident.

19   Can you restate that one more time.

20        Q.   Yes.   Which facility and housing unit were

21   you assigned to?

22        A.   CDR 13 block and cell -- I was in Cell 1-

23   -- 106.   106, I think.

24        Q.   Okay.   Thank you.   Are you still in Housing

25   Unit 13?



1      A.  No.

2      Q.  No, okay.  Can you describe Housing Unit 13

3  for me?  What is the shape of the dayroom?

4      A.  It's a -- it's like a baseball diamond.

5      Q.  Like a what?

6      A.  It's like a baseball diamond.

7      Q.  Okay.  So U-shaped?

8      A.  It's -- it's -- like right -- it's like --

9  it's like this, like that, and right in the middle is

10  the gunner, and there's A, B, and C.  Basically

11  diamond.

12      Q.  So if we're looking at like a baseball

13  diamond or U-shaped, where home plate is where the

14  gunner is?

15      A.  Yes.  If you go in, the gunner is there, and

16  A section, B, and C.

17      Q.  Okay.  Do the cells surround the dayroom?

18      A.  Yes.

19      Q.  And you mentioned that the control booth is

20  centrally located kind of where home plate would be?

21      A.  Yes.

22      Q.  Or is it more where the pitcher stand would

23  be?

24      A.  No, home plate.

25      Q.  Okay.  Is the control booth on the first or

1    second floor?

2         A.   It's on the second floor.

3         Q.   How high above the first floor is it?  Would

4    you say about 15 feet?

5         A.   Around there.  Around there.

6         Q.   Okay.  Are there windows on all three sides

7    of the control booth?

8         A.   Yes, there is.  Plenty of windows.

9         Q.   And where do the floor officers stand?

10        A.   They stand in back of -- in back of the

11   controls.  They stand in back of the controls.  If

12   anything -- if anything happens, then they have

13   access to go around all windows, and they have open

14   ports.

15        Q.   Okay.  This is the -- this would be the

16   control booth officer?

17        A.   Yes.

18        Q.   Okay.  The floor officers are different,

19   correct?

20        A.   Yes.  Yes.

21        Q.   Where do the floor officers stand?

22        A.   Right in the middle, pitcher's, in the

23   pitcher's.  Like if there was a pitcher, right in the

24   middle.

25        Q.   Okay.



1        A.  They have their little thing right there.

2        Q.  Is that called the podium?

3        A.  Yeah, it's a podium.  But they don't

4    really -- they don't sit in a podium.  They sit on a

5    table by the podium, in front of the podium.

6        Q.  Okay.  There's a table in front of the

7    podium, and they're at the table?

8        A.  With chairs, yes.  Yes.

9        Q.  And this is on the first floor?

10       A.  Yes.

11       Q.  Would you say that this table and chairs are

12   also centrally located in the dayroom?

13       A.  Uh-huh.  Right in the middle.

14       Q.  Do the table and chairs face the control

15   booth?

16       A.  Yes.

17       Q.  And they would also face all of the sections

18   of the dayroom, A, B, C?

19       A.  Yes.

20       Q.  What is behind the table and chairs?

21       A.  The podium.

22       Q.  Okay.  Is there anything behind the podium?

23       A.  There's a shower.  There's a shower behind

24   there.  There's a shower.  And then you have 126 and

25   125.

1      Q.  Okay.  So there's cells and a shower on the

2   back wall behind the table and chairs and podium?

3      A.  Yes, and right next to -- right next to the

4   shower, you've got a urinal.

5      Q.  Okay.  Thank you.  You talked a little bit

6   about your job assignment.  Are you a dining room

7   worker right now?

8      A.  Yes, I am.

9      Q.  Have you had any other job assignments while

10   incarcerated?

11      A.  Yes.  I was a porter.  I was a porter in

12   work change on DR, when I was in DR Level 3.  I've

13   been working in the kitchen for the longest time.

14   Everywhere I go, I go in the kitchen.

15      Q.  Okay.  Thank you.  Have you been convicted

16   of any rules violations while incarcerated at

17   Donovan?

18      A.  Yes.  Yes.

19      Q.  What rules have you been convicted of

20   violation?

21      A.  One for delaying a peace officer.  Delaying

22   a peace officer and pruno.

23      Q.  Okay.  Do those RVRs still stand?

24      A.  Yeah.  Yes.

25      Q.  Did you challenge any of them?



1      Q.   What is the basis of your claim against

2  Officer Escobar?

3      A.   Escobar -- Escobar failed to -- failed to,

4  you know, failed to protect me.  Failed to, you know,

5  do his duty.

6      Q.   How so?

7      A.   As a gunner, when an incident like that

8  happens, inmate was being proned out, gets up, goes

9  over, picks up a chair, the guards, and not only the

10  guards, but inmate, both of us, were under, you know,

11  attack.  I mean, if an inmate gets up, they're

12  supposed to do something about it, and they didn't.

13      Q.   So Officer Escobar was the control booth

14  officer?

15      A.   The control, yes, with the ammunition, yeah,

16  up there.

17      Q.   How long have you known Officer Escobar?

18      A.   I don't even know him.

19      Q.   Did you know him at all before the -- before

20  April 4, 2022?

21      A.   No.  I seen him around, but I never had

22  words with him.

23      Q.   Okay.  Have you ever had any negative

24  interactions with Officer Escobar?

25      A.   No.



1    didn't hear Escobar, the announcer up there.  I

2    didn't hear him at all.

3         Q.   Okay.

4         A.   I heard -- I distinctly heard Franz.

5         Q.   Okay.  Did you comply with Officer Franz's

6    orders to get down?

7         A.   Immediately.

8         Q.   Are you and was Lafita required to comply

9    with that order?

10        A.   Yes, of course.

11        Q.   What are you supposed to do when you hear a

12   "get down" order?

13        A.   Immediately -- immediately get down on your

14   stomach and put your hands behind your back.

15        Q.   Is that the prone position?

16        A.   It's the prone position, yes.

17        Q.   What did Officer Lopez do?

18        A.   I don't know.  He didn't do nothing.  I

19   mean, as far as I know.  I don't know where he was.

20   I know he was standing there watching because they

21   both sprayed us.  And the minute he got up off the

22   ground, he hit me about five or six times with the

23   chair.  And it's only obvious that they didn't take

24   him down.

25        Q.   We are still at the moment in the beginning



1        A.   Nothing.  Nothing.  I didn't hear his voice

2   on the intercom.  You know, I'm aware.  I'm still

3   aware, you know, of my surroundings, even though the

4   action is happening.  So I'm able to say what I'm

5   saying.  I didn't hear no intercom.  Obviously, he

6   didn't -- obviously, he didn't shoot.  Those weapons

7   are for him.  When a situation arises, there's no

8   warning shots.  He's supposed to shoot if there's a

9   clear shot, and there was.

10       Q.   How do you know there was a clear shot?

11       A.   Because it's -- he was diagonal.  There was

12  diagonal where the window, where it opens up, they

13  open up on different sides, different sides.  There's

14  an angle where he could -- where they were standing

15  by 125, about two feet away from 124, from 124, Lopez

16  and -- Lopez and Franz were standing two feet from

17  125.  And it was right in the middle of 124 and 25

18  that we were fighting.  So it's more over to the

19  showers where they were, where we were fighting over

20  here, and Ms. Franz and them were right here.  And he

21  got a direct shot.  It's just self-explanatory if you

22  see it.  That's why I'm asking you for the tape.

23       Q.   Of course.  So you were fighting between

24  Cell 124 and 125.  Where were Officer Lopez and

25  Officer Franz?



1      A.   Yes.

2      Q.   -- and proned out --

3      A.   Yes.

4      Q.   -- when he heard the alarm?

5      A.   Yes.

6      Q.   What does the alarm sound like?

7      A.   It's just a (Descriptive sound).

8      Q.   Is it loud?

9      A.   Yeah.

10     Q.   Is it repetitive?

11     A.   Yes.

12     Q.   Can you hear the alarm inside the dayroom?

13     A.   Yes.  Very loud.

14     Q.   Can you hear it outside the building?

15     A.   Yes.

16     Q.   How many times did Lafita strike you before

17  you were both pepper sprayed?

18     A.   I don't know which one -- when he got off

19  the floor or when he first was hitting me?

20     Q.   When he first came out of the cell.

21     A.   Oh, a lot of times.

22     Q.   Do you know how long he was hitting you

23  before you were pepper sprayed?

24     A.   For about a good 30 seconds.  Just nonstop.

25     Q.   Okay.  Before you both proned out, you were

1    orders?

2        A.   He might have.   I did not hear him.

3        Q.   Okay.   What did Officer Lopez do when Lafita

4    picked up the chair?

5        A.   Again, I don't -- I don't know.   He didn't

6    do nothing because I was being attacked.   It was not

7    until Pillapano came in, an officer from the outside,

8    came in and stopped it and sprayed him and ordered

9    him to get down.   I don't know if he tackled him down

10   or he sprayed him enough to where he got down on his

11   own.   I don't know.   I just know that I got saved by

12   an officer from outside.

13       Q.   Okay.   So is this your same answer with

14   Officer Franz, you don't know what she was doing?

15       A.   No, I don't.   No.

16       Q.   Okay.

17       A.   I just know that she didn't take -- nothing

18   happened -- they didn't do nothing to him because he

19   was still pouncing on me with the chair.

20       Q.   Were you able to see Officer Lopez and

21   Officer Franz even though you were being attacked?

22       A.   No.   I knew they were standing right there.

23   I knew they were standing right there.   But I wasn't

24   looking at them to see what they were going to do.   I

25   was just fighting for my life.   I was hoping in my



1    mind, hoping they do get him off me.

2        Q.  What about Officer Escobar; could you see if

3    Officer Escobar was doing anything?

4        A.  I couldn't see.  I assumed he had his weapon

5    in his hand, and they say he did.  And he didn't

6    shoot.  He didn't shoot or didn't hear nothing.  They

7    didn't take him down.  He wasn't shot.  I didn't hear

8    no gunshot or nothing.  I assume that he froze.

9        Q.  Did you feel any pepper spray at all while

10   Lafita was hitting you with the chair?

11       A.  No, absolutely not.

12       Q.  Okay.  And Officer Lopez and Officer Franz,

13   we had talked a little bit about what Officer

14   Escobar's line of sight might be.  Were they -- were

15   they still in between the control booth and Officer

16   Escobar?

17       A.  Say that one more time.  Sorry.

18       Q.  Were Officers Lopez and Franz in between the

19   fight and the control booth?

20       A.  No.  No, they weren't.  They were off to the

21   side.  They were by -- they were more by Lafita,

22   Lafita's side.  And I was proned out in the middle of

23   124 and 125.  Lafita was proned out a little bit by

24   125, a little bit on that side, while Lopez and Franz

25   were standing more by him.  So they had a direct



1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4                That the foregoing proceedings were

5    taken before me at the time and place therein set

6    forth; that the witnesses in the foregoing

7    proceedings, prior to testifying, were placed under

8    oath; that a verbatim record of the proceedings was

9    made by me using machine shorthand which was

10   thereafter transcribed under my direction; further,

11   that the foregoing is an accurate transcription

12   thereof.

13               I further certify that I am neither

14   financially interested in the action nor a relative

15   or employee of any attorney or of any of the parties.

16               IN WITNESS WHEREOF, I have this date

17   subscribed my name.

18

19          Dated February 28, 2023.

20

21

22

23   _____
     LAURA J. BOLLSCHWEILER
     CSR No. 10500

24

25

Notice Date: 02/28/2023

Deposition Date: 2/23/2023

Deponent: David Serna (E25219)

Case Name: Alfred David Serna v. Warden Madden, et al.

Page:Line              Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

# EXHIBIT B

**NAME and NUMBER: SERNA, ALFRED**       **E25219**       **C11-136L**       **CDC-128B**

On Thursday, March 2, 2023, at <u>1000</u> hours, at Richard J. Donovan Correctional Facility (RJD), Board of Parole Hearings (BPH) office, 480 Alta Road San Diego, CA. 92179, County of San Diego, I interviewed Inmate **SERNA, ALFRED (E25219) C11-136L,** for the purpose of viewing video footage of the one-on-one fight between him and Inmate Lafita, on Monday, April 4, 2022 for the case of: Serna v. Madden, case number 22cv841-JLS-DEB.

Specifically, inmate **SERNA** viewed the video footage of the one-on-one fight between him and Inmate Lafita on Monday, April 4, 2022. Inmate **SERNA** was allowed to view the contents of the video footage utilizing a state computer, but he was not allowed to keep the footage. Inmate **SERNA** was allowed to pause, rewind and review the video footage at his leisure. Inmate **SERNA** also arrived to BPH with a pen and paper to take notes of the video footage for future reference**.**

Inmate **SERNA** watched the following videos**:**
- C 13 CNTRL C042011-2022-04-04_09h18min00s000ms.g64x
- C 13 FLR 2 C042013-2022-04-04_09h18min00s000ms
- C 14 FLR 1 C042015-2022-04-04_09h19min10s000ms
- C 15 FLR 1 C042018-2022-04-04_09h19min10s000ms
- C SPARE 04 C040004-2022-04-04_09h18min00s000ms
- HCA C 14 ESCRT EOP 2 C042041-2022-04-04_09h19min10s000ms
- HCA C 15 ESCRT EOP 2 C042045-2022-04-04_09h19min10s000ms
- HCA C SEC PAT TRT CTR 1 C042037-2022-04-04_09h19min10s000ms
- HU13 A Section Telephones-2022-04-04_09h18min00s000ms
- HU13 B Section Cells_Dayroom Left-2022-04-04_09h18min00s000ms
- HU13 B Section Cells_Dayroom Right-2022-04-04_09h18min00s000ms
- HU13 Podium 1-2022-04-04_09h18min00s000ms
- HU13 Podium 2-2022-04-04_09h18min00s000ms

Inmate **SERNA** viewed the video footage for approximately one (1) hour. Inmate **SERNA** notified me when he was finished viewing the video footage, I brought the footage back to the litigation office for archive.

**SERNA** has a TABE score of 9.6. Effective communication was achieved by speaking slowly, clearly, using simple language, and having **SERNA** repeat back in his own words what was discussed. Effective communication was established.

DocuSigned by:

Vincent Mcsee

—————————————————
287333774C324F8...

**V. MCSEE**
**CORRECTIONAL COUNSELOR II**
**LIGITATION COORDINATOR**
**RICHARD J. DONOVAN CORRECTIONAL FACILITY**

**DATE: 03/02/2023**          **Litigation Document**          **GENERAL CHRONO**